237 N.J. Super. 305 (1989)
567 A.2d 1010
JAMES NIGRO, PLAINTIFF-RESPONDENT,
v.
PLANNING BOARD OF THE BOROUGH OF SADDLE RIVER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 6, 1989.
Decided November 20, 1989.
Before Judges BILDER and ASHBEY.
Stuart R. Koenig argued the cause for appellant (Stickel, Koenig & Sullivan, attorneys; Stuart R. Koenig, on the brief).
Robert E. Martini argued the cause for respondent.
PER CURIAM.
This is an appeal by a planning board from a final judgment of the Law Division reversing its denial of an application for preliminary subdivision approval as unreasonable, arbitrary and *306 capricious. Defendant Saddle River Planning Board contends the street layout of the proposed subdivision did not conform to the officially adopted official map; that the official map was statutorily conclusive with respect to the street location; that it therefore could not lawfully approve a proposal that failed to conform to the official map; and that ergo, of necessity, its action could not have been unreasonable, arbitrary or capricious. We agree.
This litigation involves a 25.5 acre tract in Saddle River which is still devoted to farming. It is essentially surrounded by the rear lots of developed residential properties containing at least two acres. Importantly to this case, it is bounded to the north by lots facing Glenwood Drive and to the south by lots facing Twin Brooks Road.
Plaintiff James Nigro is the contract purchaser of some eight acres on the western side of the undeveloped tract. The present owners, the Demarests, are unwilling to sell the remaining 17.5 acres upon which they plan to continue their farming operation. Nigro applied to the Planning Board for preliminary approval of a major subdivision in which four new residential lots would be created in the western part of the Demarest tract. The lots in the proposed subdivision conform with the required areas and frontages but the proposed street access does not conform to that shown in the existing master plan and official map. Negro proposes to provide access by the construction of a new street running north from Twin Brooks Road; the official map shows access to the Demarest tract will be provided by a proposed street running south from Glenwood Drive. In order to construct his proposed access road, Nigro has acquired a residential tract on Twin Brooks Road. The access road shown on the official map enters the Demarest tract through the eastern portion which is not presently available for development. There is no evidence as to the availability or cost of an access tract on the Glenwood Drive side.
*307 The Planning Board denied the application upon findings, inter alia, that the proposed subdivision was inconsistent with the master plan and the official map. In its conclusions, it properly identified the basic issue.
The basic problem arises in that the property owner wishes to develop the property in a manner different than that recognized in the Master Plan and Official Map of the municipality. Those documents provide for development of the tract from Glenwood Drive. The property owner has chosen to sell off the portion of the property in question which is located some distance from the roadway access to the property at Glenwood Drive. The applicant has been able to acquire property on Twin Brooks Road and provide an area of access by way of public street. The basic conflict arises in creating a public street in an area where single family residential homes exist where no street was ever contemplated, and in a location not conforming to the planning process of the municipality which clearly contemplated development from Glenwood Drive.
The trial judge considered the street locations as shown in the master plan and official map as proposed locations  merely tentative proposals for later discussion and consideration. They were, she concluded, nonbinding. In her view, the evidence showed good planning reasons for the development of the property from the south.[1] She found the action of the Planning Board to be arbitrary and capricious and remanded the matter with directions to grant the requested subdivision approval.
We are satisfied that the trial judge's action in treating the official map as tentative  as merely showing a nonbinding proposed rights-of-way  was error. Such is not the law. The legislature has decreed to the contrary.
The official map shall be deemed conclusive with respect to the location and width of streets and public drainage ways and the location and extent of flood *308 control basins and public areas, whether or not such streets, ways, basins or areas are improved or unimproved or are in actual physical existence. [N.J.S.A. 40:55D-32]
The language is clear and unambiguous. We are not at liberty to construe it otherwise. See Service Armament Co. v. Hyland, 70 N.J. 550, 556 (1976); Gangemi v. Berry, 25 N.J. 1, 10 (1957).
Moreover, this clear meaning construction is supported by an examination of the nature of an official map. New Jersey early accepted the notion of planning the systematic physical development of a community. See Kligman v. Lautman, 53 N.J. 517, 534 (1969); Cunningham, Control of Land Use in New Jersey, 15 Rut.L.Rev. 1, 2-3 (1960). Municipal planning has been authorized since 1930. Ibid. And from the beginning New Jersey permitted the adoption, by ordinance, of an official map to be deemed conclusive with respect to the location and width of streets, parks and playgrounds; Mansfield & Swett, Inc. v. West Orange, 120 N.J.L. 145, 149 (Sup.Ct. 1938). This concept has been continued and is presently contained in Article 5 of the Municipal Land Use Law. N.J.S.A. 40:55D-32 to 34. Unlike other planning devices, the official map forecasts with precision the location of streets, drainage ways, parks and playgrounds so as to provide some continuity in the planning process. See 5 Williams, American Planning Law § 155 (1985) at 325-326. It not only provides a blueprint of the size and location of such existing and proposed public uses but protects proposed sites from other use and guides the development of land in accordance with the preconceived lines for sound and orderly growth. See 4 Anderson, American Law of Zoning 2nd § 24.02 (1977). It has been described as "a device for putting some teeth on the otherwise advisory effect of certain aspects of a master plan." See Kligman v. Lautman, supra, 53 N.J. at 535, n. 2. Unlike other planning devices, the official map represents solemn action by the governing body which adopts it by ordinance after public hearing. See Bernstein, The Impact of the New Official Map on Municipalities, *309 New Jersey Municipalities (February 1955) 23. It can be fairly characterized as the skeletal framework upon which the community can develop and grow.
The integrity of this framework is a repeated theme. No structures can be built on the bed of a proposed street.[2]N.J.S.A. 40:55D-34. In general, buildings must be on lots which abut streets appearing on the official map. N.J.S.A. 40:55D-35. See also Bernstein, supra. This is not to say that lots cannot be developed which do not abut such a street. Streets which appear on a planning board approved plat are sufficient, ibid., but by implication such streets are intended to fill out the skeleton, not conflict with it. See Levin v. Livingston Tp., 35 N.J. 500, 511 (1961). It is significant that the legislature provided hardship relief from the bar to construction in the bed of a proposed street, N.J.S.A. 40:55D-34, but made no similar provision for street alignment. In the case of construction in a proposed street bed, the relief must interfere with the planned street as little as practicable. N.J.S.A. 40:55D-34. Amendments, i.e., a restructuring of the skeleton, are for the governing body. N.J.S.A. 40:55D-32. Whether the official map should be amended to provide access to the tract which plaintiff seeks to develop is a matter for the governing body.
In sum, we are satisfied that the Planning Board could not lawfully approve plaintiff's application because it conflicted with the official map. Its action was proper and must be sustained.
Reversed.
NOTES
[1] The Planning Board gave numerous other reasons for denial, none of which are relevant to the principal issue in this case. These were: the application would ultimately cause multiple access roadways each with a cul-de-sac rather than the single one contemplated by the Master Plan and official map; these roadways would be steep and exceed the grade limit required by the zoning ordinance; the creation of the proposed access road would convert an existing lot facing only Twin Brooks Road into a corner lot and thereby deprive the owner of the practical use of part of his existing backyard. The trial judge found that, in any event, a waiver of grade would be necessary.
[2] References to streets hereafter are made for convenience since this case involves a street. The statutes, of course, refer to a number of other public uses, e.g., drainage basins, parks, etc.